## STATE v. MICHAEL DeSCHEPPER.

231 N. W. 2d 294.

June 20, 1975—No. 44769.

*C. Paul Jones,* State Public Defender, and *Mollie G. Raskind,* Assistant State Public Defender, for appellant.

*Warren Spannaus,* Attorney General, *Peter W. Sipkins,* Solicitor General, *Richard B. Allyn,* Assistant Attorney General, *Gary Hansen,* Special Assistant Attorney General, and *Marlyn Vollmer,* County Attorney, for respondent.

Heard before Kelly, Todd, and Chanak, JJ., and considered and decided by the court en banc.

NICHOLAS S. CHANAK, JUSTICE.*

On appeal to district court from a conviction in municipal court on a charge of speeding, defendant was tried de novo by

*Acting as Justice of the Supreme Court by appointment pursuant to Minn. Const. art. 6, § 2, and Minn. St. 2.724, subd. 2.

jury and acquitted. Thereafter defendant was indicated for perjury for alleged false statements uttered while testifying in the speeding trial in district court. From judgment of conviction[1] for perjury, Minn. St. 609.48, subd. 1, in the District Court of Rock County, defendant appeals.

The incident out of which both the speeding charge and the perjury charge arose occurred on September 18, 1971. Most of the facts are not in dispute. On that evening, defendant and three of his friends were driving around in various small towns near Pipestone, Minnesota. Defendant and Glen Hubers occupied the front seat of the automobile, which was owned by Hubers' brother. Dave Hartz and Janice Skyberg occupied the back seat.

Shortly before they reached the town of Jasper, defendant, whose driver's license had been revoked, took over the driving. At about 9 p. m. Officer Glen Buskerud of the Jasper village police recognized defendant driving and, knowing of the license revocation, followed the vehicle. Defendant attempted to elude the police car on a 7-block course through Jasper, all of which streets were in Pipestone County. The last block was an "S" curve, running in a southeasterly direction, which merged into County State Aid Highway No. 1 (hereafter Highway No. 1), proceeding in an easterly direction. Highway No. 1 forms the dividing line between Pipestone and Rock Counties, its eastbound lane being in Rock County and its westbound lane in Pipestone County. Thus, the vehicle occupied by defendant left the "S" curve in Jasper and entered into Rock County. The speed limit on Highway No. 1 was 55 miles per hour.

Hubers' vehicle was within the sight of the officer except for the last 2 blocks during which it traversed the "S" curve. As the pursued vehicle was entering Highway No. 1 the officer again sighted the vehicle, at that time being 2 blocks ahead of him. When the officer reached the same juncture, the other vehicle

---

[1] Defendant was sentenced to 3 years' imprisonment and a $1,000 fine; execution was stayed on the prison term and half of the fine was suspended.

was about 1/2 to 3/4 of a mile down Highway No. 1. The officer continued to give chase, the vehicles reaching speeds from 90 to 100 miles per hour. The gap remained constant except that the officer felt that during the third mile of the 4-mile chase he narrowed the gap to less than half a mile. Approximately 4 miles down the highway, the vehicle turned north onto a gravel road, at which point the officer abandoned his pursuit.

Defendant was charged with speeding in Rock County. At trial in the district court on that charge, defendant claimed that he and Glen Hubers had switched positions within the "S" curve while the vehicle was moving at approximately 20 miles per hour before entering Rock County and that Hubers was the driver in Rock County. Hubers testified that the switch took place approximately 2 miles down Highway No. 1 while the vehicle was traveling at 90 to 100 miles per hour. Passenger Hartz corroborated defendant, with Skyberg testifying that she observed the switch on the "S" curve. However, on cross-examination Skyberg stated she was not sure that she saw the shift. The officer could not see the switch at any point because of the darkness and the distance between the vehicles.

The jury acquitted defendant of speeding. A grand jury on February 12, 1973, indicted defendant for perjury. The indictment specified:

"* * * [T]he said Michael DeSchepper then and there did willfully, wrongfully, unlawfully, knowingly and feloniously as a witness in said trial as aforesaid, testify falsely in substance and to the effect that he, the said Michael DeSchepper, as defendant in said matter, was not driving said motor vehicle involved in said speeding offense on Pipestone County State Aid Highway No. 1 in the County of Rock, Minnesota, as charged in said complaint, * * *."

The evidence presented by both the state and the defense at the perjury trial was substantially similar to that presented at the speeding trial, except that the state did produce three addi-

tional witnesses. One Jennifer A. Hemmingson testified that defendant had told her the day after the incident that the switch of drivers occurred "out east of town." Mark S. Matson testified he overheard defendant tell Glen Hubers about a month after the incident that he (defendant) was driving at the time of the speeding but that Hubers could not prove it because Hubers did not have any witnesses. On the same occasion, Kevin Benson was also present and overheard defendant say to Hubers, "I know I was driving, but you can't prove it." The jury convicted defendant of perjury.

The trial court denied defendant's motion to dismiss the indictment and his post-trial motion for judgment notwithstanding the verdict or for a new trial, holding that the second prosecution was not barred. We affirm.

The only issue before this court on appeal is whether the state was estopped by the judgment of acquittal on the speeding charge from prosecuting defendant for perjury on the basis of his testimony at the speeding trial that he did not drive the vehicle in Rock County.

The courts have long struggled with the question of when acquittal of a crime will bar the defendant's subsequent prosecution for perjury for testimony given in his own behalf at trial. Five different rules have been advocated by various courts and commentators. They may be briefly summarized as follows:

(1) A person acquitted of an offense is wholly immunized from subsequent prosecution for perjury based upon testimony given in his own behalf at the first trial.[2]

(2) A person acquitted of an offense may always be prosecuted for perjury based upon testimony given in his own defense, without regard to the nature of the testimony and even though

---

[2] This rule has never been adopted by an American court. It is not clear whether defendant seriously urges its adoption. He does note with approval, however, that a number of the civil law countries permit a defendant in a criminal case to testify in his own defense without taking an oath. See, Silving, *The Oath: II*, 68 Yale L. J. 1526.

the two verdicts are logically inconsistent (for convenience, hereafter "no bar" rule).[3]

(3) A person acquitted of an offense may not be prosecuted for perjury based upon testimony given in his own defense if a conviction of perjury would necessarily import a contradiction of the acquittal (for convenience, hereafter "issues necessarily adjudicated" rule).[4]

(4) A person acquitted of an offense may not be prosecuted for perjury based upon testimony given in his own defense if it appears from the record that the factfinder probably passed upon the credibility of the testimony in question in order to reach its verdict of acquittal (for convenience, hereafter "issues probably adjudicated" rule).[5]

(5) A person acquitted of an offense may not be prosecuted for perjury based upon testimony given in his own defense unless the state introduces evidence at the perjury trial which was not available to the factfinder at the first trial and which inde-

---

[3] See, e. g., State v. Nierenberg, 80 N. W. 2d 104 (N.D. 1956); Slayton v. Commonwealth, 185 Va. 371, 38 S. E. 2d 485 (1946); People v. Niles, 300 Ill. 458, 133 N. E. 252 (1921); Teague v. Commonwealth, 172 Ky. 665, 189 S. W. 908 (1916); State v. Vandemark, 77 Conn. 201, 58 A. 715 (1904).

[4] See, e. g., Wheatley v. United States, 286 F. 2d 519 (10 Cir. 1961); Ehrlich v. United States, 145 F. 2d 693 (5 Cir. 1944); Kuskulis v. United States, 37 F. 2d 241 (10 Cir. 1929); Youngblood v. United States, 266 F. 795 (8 Cir. 1920); Chitwood v. United States, 178 F. 442 (8 Cir. 1910); Commonwealth v. Rose, 214 Pa. Super. 50, 251 A. 2d 815 (1969); State v. Leonard, 236 N. C. 126, 72 S. E. 2d 1 (1952); People v. Housman, 44 Cal. App. 2d 619, 112 P. 2d 944 (1941); Yarbrough v. State, 79 Fla. 256, 83 So. 873 (1920); Jay v. State, 15 Ala. App. 255, 73 So. 137, certiorari denied, 198 Ala. 691, 73 So. 1000 (1916); United States v. Haines, 485 F. 2d 564 (7 Cir. 1973); United States v. Nash, 447 F. 2d 1382 (4 Cir. 1971); United States v. Williams, 341 U. S. 58, 71 S. Ct. 595, 95 L. ed. 747 (1951).

[5] See, e. g., United States v. Drevetzki, 338 F. Supp. 403 (N. D. Ill. 1972).

pendently tends to establish that defendant committed perjury while testifying in his own behalf.[6]

No "majority rule" suggests itself upon a reading of the more than 50 reported cases which have considered the problem. The acceptability of each of these rules varies widely over time and across jurisdictional boundaries. Perhaps the only generalization which may be drawn is that the Federal courts have traditionally been more likely than the state courts to bar the perjury prosecution.[7]

The diversity of authority flows from the difficulty of balancing the competing public policy goals to be served. The dilemma faced by the courts in attempting to protect simultaneously the administration of justice from rampant perjury and the criminal defendant from potential prosecutorial harassment was well stated in Adams v. United States, 287 F. 2d 701, 703 (5 Cir. 1961):

"Two opposing policy considerations have weighed heavily in prior determinations of this problem. On the one hand the concern exists that allowing an acquittal to afford any sort of insulation for perjury will be giving defendants an uncontrollable license to testify falsely. The resulting detriment to the reliability of evidence and more so, to the stability of the judicial process, would only be enhanced by the obvious fact that the more persuasively flagrant the defendant's fabrication, the greater his chances of total exoneration. This completes a vicious circle since the successful acquittal on the substantive offense would immunize him as to the very falsehoods which brought it about. On the other hand some apprehension exists that allowing prosecution for perjury will actually give the state a second shot at the defendant for the same wrong. The mere fact, this argument continues, that one charge relates to the doing of an act and the

---

[6] See, e. g., United States v. Nash, 447 F. 2d 1382, 1386 (4 Cir. 1971) (concurring opinion); Kuskulis v. United States, 37 F. 2d 241 (10 Cir. 1929) (dictum); Allen v. United States, 194 F. 664 (4 Cir. 1912).

[7] Note, 74 Harv. L. Rev. 752, 761.

other to a denial of having done it, or to affirmative proof that it was not so done, is not sufficient basis on which to make a distinction."

Over 60 years ago we expressed ourselves as to the proper resolution of the dilemma. In State v. Smith, 119 Minn. 107, 137 N. W. 295 (1912), defendant was acquitted of arson, testifying at his trial that he was not at the building at the time of the offense and that he had never admitted or confessed to burning the building. He was convicted of perjury for that testimony. In affirming his conviction, we reasoned that defendant might have been at the shed at the time of the offense and might have admitted burning it, yet still have been innocent of arson. We stated the applicable rule as follows:

"The defendant claims that in no event could he be legally convicted in this action, because the judgment of not guilty, rendered in the arson case, was ipso facto res adjudicata and a bar to his subsequent prosecution for any perjury committed by him on that trial. There are some authorities in the books which may be fairly claimed to so hold. * * * The great weight of authority, however, and we think also of reason, is to the contrary. * * *

"We hold that the rule applicable to the instant case is that, unless a conviction of the charge of perjury *necessarily imports* a contradiction of the jury's verdict of not guilty in the arson case, then the prosecution for perjury is not barred; and, further, that no such contradiction here appears." (Italics supplied.) 119 Minn. 112, 137 N. W. 297.

Defendant takes the position that the verdicts in the two cases were necessarily inconsistent and that the jury in the speeding case necessarily passed upon the credibility of defendant's testimony that the switch of drivers took place while the vehicle was still in Pipestone County. Thus, he argues, the doctrine of collateral estoppel should apply. Failure of the trial court to apply it, he claims, resulted in double jeopardy and denied defendant due process of law. In support of this position, defendant relies

upon Ashe v. Swenson, 397 U. S. 436, 90 S. Ct. 1189, 25 L. ed. 2d 469 (1970), in which the United States Supreme Court held that the Fifth Amendment guarantee against double jeopardy incorporates the concept of collateral estoppel.

The state, on the other hand, argues that the verdicts in the two cases are not necessarily inconsistent. It takes the position that the first jury might have believed that the car was not speeding while in Rock County even though it believed that defendant drove the vehicle down Highway No. 1 in Rock County. The state also argues that even if the two verdicts are inconsistent, the second prosecution is not barred. In other words, it urges us to adopt either the "issues necessarily adjudicated" rule or the "no bar" rule.

The trial court expressly rejected the rule of Smith, declining to consider itself bound by dictum from a 1912 decision. Instead, the trial court treated the problem as one of first impression, resolving the split of authority in favor of the rule that the perjury prosecution is never to be barred, though considered inconsistent with the verdict of acquittal in the first trial.

We do not believe that Smith should be disregarded, as we fail to see how the intervening years have in any way undermined the logic or equity of the rule set forth in Smith. We prefer to adhere to it.

It has been suggested that Ashe v. Swenson, *supra,* requires us to abandon the rule of Smith. In Ashe, a group of six poker players had been the victims of an armed robbery. Defendant was acquitted of robbing one poker player, the jury returning a verdict of "not guilty due to insufficient evidence." He was subsequently convicted of robbing a second poker player. The state readily admitted that it had used the first trial as a sort of "dry run" and had patched the holes in its case on the basis of the turn of events at the first trial. The Supreme Court held that the guarantee against double jeopardy incorporates the doctrine of collateral estoppel, and held that the second prosecution of de-

fendant was barred on the theory that his participation in the crime had been litigated at the first trial.

In our view there are a number of reasons why Ashe does not require us to abandon the rule of Smith. There is a respectable body of authority which concludes that the concepts of res judicata and collateral estoppel do not apply to a judgment procured by fraud or perjury. Some suggest that Ashe does not require a state to give collateral-estoppel effect to a verdict of acquittal if the defendant committed perjury to obtain it.[8] In the context of civil litigation we have held that a civil verdict procured by fraud will not collaterally estop relitigation of the issues already adjudicated.[9]

In State v. Redinger, 64 N. J. 41, 312 A. 2d 129 (1973), the court concluded that the Fifth Amendment prohibition against twice putting a person in jeopardy "for the same offense" did not apply where the "offenses" involved are as different as a substantive crime (careless driving) on the one hand, and perjury committed at the trial of the charge of commission of that crime on the other. The court stated (64 N. J. 50, 312 A. 2d 134):

"* * * We think that in such case the United States Supreme Court would limit the authority of *Ashe,* insofar as double jeopardy in the Fifth Amendment sense is concerned, at least where state court proceedings are involved."

However, we neither rest nor rely upon the reasons just stated, as we do not read the test of collateral estoppel set forth in Ashe as inconsistent with the test set forth in Smith. Smith would bar the subsequent perjury prosecution only if a conviction for perjury would be "necessarily" inconsistent with the verdict of acquittal on the substantive charge. Although Ashe does not em-

---

[8] See, State v. Redinger, 64 N. J. 41, 312 A. 2d 129 (1973); cf., United States v. Gremillion, 464 F. 2d 901 (5 Cir.), certiorari denied, 409 U. S. 1085, 93 S. Ct. 683, 34 L. ed. 2d 672 (1972). See, also, Teague v. Commonwealth, 172 Ky. 665, 189 S. W. 908 (1916).

[9] Halloran v. Blue & White Liberty Cab Co. Inc. 253 Minn. 436, 92 N. W. 2d 794 (1958).

ploy precisely the same language, we read it as expressing the same concept.

Ashe expresses the constitutional test as follows:

"* * * [T]he rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality. Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to 'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude *whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.*'" (Italics supplied.) 397 U. S. 444, 90 S. Ct. 1194, 25 L. ed. 2d 475.

This is but another way of saying that the issue which defendant seeks to foreclose must necessarily have been adjudicated in the first trial. See, State v. Tijerina, 86 N. M. 31, 519 P. 2d 127 (1973), certiorari denied, 417 U. S. 956, 94 S. Ct. 3085, 41 L. ed. 2d 674 (1974). At least three Circuit Courts of Appeal have interpreted Ashe in just this fashion in applying it to a subsequent prosecution for perjury.

In United States v. Gugliaro, 501 F. 2d 68 (2 Cir. 1974), and United States v. Tramunti, 500 F. 2d 1334 (2 Cir. 1974), the court held that acquittals of conspiracy to commit securities fraud did not bar defendants' subsequent convictions for perjury for falsely swearing that they were not present at a meeting of the conspirators, as the first jury might have disbelieved their denials and still found that they lacked the knowledge or intent necessary to be conspirators.

In United States v. Nash, 447 F. 2d 1382 (4 Cir. 1971), the court applied the "issues necessarily adjudicated" rule in reversing a perjury conviction where there were two mutually exclusive explanations of defendant's possession of coins, and the jury necessarily had to pass upon the truthfulness of defendant's account.

The same rule was applied in United States v. Haines, 485 F. 2d 564 (7 Cir. 1973), where defendant had previously been acquitted on a robbery charge after interposing the defense of alibi, and his later perjury conviction was affirmed. In affirming, the court stated:

"* * * Unless the record of the prior proceeding affirmatively demonstrates that an issue involved in the second trial was definitely determined in the former trial, the possibility that it may have been does not prevent the relitigation of that issue." 485 F. 2d 565.

In Haines, the court reasoned that the jury could have disbelieved the defendant's alibi testimony and still reached a verdict of acquittal and that there was no necessary inconsistency between defendant's acquittal of the bank robbery charge and his not being at the place of alibi. The court's position was expressed in these words:

"* * * [T]he jury could have discredited the defendant's testimony concerning his whereabouts at the time of the alleged offense, and still arrived at the conclusion that the government had failed to prove that he was a participant in the bank robbery. Thus, the issue regarding the veracity of the facts constituting the alibi defense was not necessarily adjudicated at the bank robbery trial." 485 F. 2d 566.

We find further support for our views in the general rule of collateral estoppel stated in Ashe (397 U. S. 443, 90 S. Ct. 1194, 25 L. ed. 2d 475):

" 'Collateral estoppel' is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit."

An issue of ultimate fact is the essential ingredient for the ap-

plication of collateral estoppel. See, United States v. Haines, *supra*; United States v. Gugliaro, *supra*. Under this rule, a "collateral issue," a "peripheral issue," and a "tangential issue" are excluded from its application.

The burden rests on defendant to show that the jury's verdict in the first trial must have "necessarily decided the issues raised in the second prosecution." United States v. Gugliaro, *supra*; United States v. Tramunti, *supra*. See, State v. Hite, 3 Wash. App. 9, 472 P. 2d 600 (1970). See, also, State v. Robinson, 262 Minn. 79, 114 N. W. 2d 737, certiorari denied, 371 U. S. 815, 83 S. Ct. 26, 9 L. ed. 2d 56 (1962).

Buttressing our interpretation of Ashe is the fact that the Supreme Court did not overrule United States v. Williams, 341 U. S. 58, 71 S. Ct. 595, 95 L. ed. 747 (1950), the only United States Supreme Court decision ever to consider collateral estoppel in the context of a perjury conviction based upon testimony given to attain acquittal of another offense. There, the court adopted the rule[10] that an issue is foreclosed from litigation in a perjury case only if necessarily determined by the jury in reaching the previous verdict of acquittal. In rejecting the collateral estoppel defense, the court reasoned that the jury which acquitted the defendants of aiding and abetting did not necessarily pass upon the credibility of defendants' testimony that they did not see the offense committed.

We conclude that the constitutional limitations set forth in Ashe v. Swenson, *supra*, are not inconsistent with the principle we approved in Smith. Consequently we adhere to the rule expressed in that case.

Applying the Smith test to the facts of this case, we hold that defendant's conviction of perjury did not necessarily import a contradiction of the jury's verdict of not guilty in the speeding case.

---

[10] This rule has only persuasive force since it was adopted under the court's supervisory powers and did not involve an interpretation of the Fifth Amendment.

Upon defendant's motion for judgment notwithstanding the verdict or a new trial, the trial court stated that it considered the conviction of perjury and the acquittal of speeding to be necessarily inconsistent verdicts. As Ashe holds that the question of inconsistency of the two verdicts is a question of constitutional fact, we may, and do, exercise our power to substitute our judgment on the issue for that of the trial court. 397 U. S. 443, 90 S. Ct. 1194, 25 L. ed. 2d 475. Ashe enjoins us to examine this question taking into account the "pleadings, evidence, charge, and other relevant matter." 397 U. S. 444, 90 S. Ct. 1194, 25 L. ed. 2d 475.

We must, then, determine whether the first jury in acquitting defendant of the charge of speeding must necessarily have believed defendant's testimony as to the location of the vehicle at the time the drivers switched or whether they might have disbelieved his testimony and yet acquitted him because of the failure of the state to prove a necessary element of its case. In deciding whether the truth of defendant's testimony was necessarily determined in that first trial we may not assume "that the jury may have disbelieved substantial and uncontradicted evidence of the prosecution on a point the defendant did not contest." 397 U. S. 444, note 9, 90 S. Ct. 1194, 25 L. ed. 2d 476.

Thus, we must ask what were the issues submitted to the jury at the speeding trial. The trial court's charge delineated those issues as follows:

"* * * Now, the State must prove all of the elements of the charge against the Defendant beyond a reasonable doubt. That is, it must prove first, that the Defendant, Michael DeSchepper, was driving an automobile on a public highway in the County of Rock on or about September 18, 1971; and, two, that he was driving that automobile at that time and place at a speed in excess of 55 miles per hour."

From the language of the charge it is clear that defendant put

the state to its proof as to all elements of the offense.[11] Two distinct issues were put to the jury: (1) Whether defendant was driving in Rock County, and (2) whether he was driving at that time and place at a speed in excess of 55 miles per hour.

Threaded through defendant's arguments is an unexpressed assumption that the vehicle was speeding from the moment it entered Rock County on Highway No. 1. There is no evidence to sustain that assumption.

The physical layout of the last two blocks traveled within the village of Jasper before entry onto Highway No. 1 is significant. The direction of travel was south on the first block and at its intersection with Main Street a sign required a stop before entering the last block which was in the form of an "S" curve to the southeast. Defendant admits he did not stop as required but continued into the "S" curve at 20 miles per hour. The officer, who was not in a position to view the stop violation, stopped at the stop sign and yielded to two other vehicles traveling on Main Street while the Hubers vehicle continued down Highway No. 1. The speed limit, not absolute, was 55 miles per hour. The officer could not precisely identify the point at which the speeding on Highway No. 1 began, but could only testify that the vehicle was speeding after he had followed it down Highway No. 1.

That a switch did occur and that speeding did occur were not disputed. The points at which each occurred were contested.

The prosecution had to prove that at the point of speeding on Highway No. 1 in Rock County defendant was driving. But to establish that, it did not have to prove that the switch was not made in Pipestone County. That was in no essence an element of the state's case. It was, or might be, a persuasive evidentiary circumstance helpful to defendant by affording him a specific means of disproving his operation of the speeding car in Rock County by affirmatively proving that the switch occurred in Pipestone County. On the other hand, defendant's successful de-

---

[11] Cf., State v. Robinson, 262 Minn. 79, 114 N. W. 2d 737, certiorari denied, 371 U. S. 815, 83 S. Ct. 26, 9 L. ed. 2d 56 (1962).

fense did not necessarily turn on his establishing the switch in Pipestone County. Under the court's charge, the jury, at most, merely found that defendant was not driving at the point of speeding. But that was not a finding that he switched in Pipestone County. He may have switched at any point in Pipestone or in Rock County up to the place of speeding. This leads courts to consider as a "collateral issue" any fact which, if established on the perjury trial to have been false, is not inconsistent with the prior determination of innocence.

Defendant argues that we should adopt the holding and reasoning of United States v. Drevetzki, 338 F. Supp. 403 (N.D. Ill. 1972), in which the court applied the doctrine of collateral estoppel to a peripheral or tangential issue. Defendant here does not claim that the issue in question was peripheral or tangential, but rather that it was one of ultimate fact. We decline to apply Drevetzki for three reasons: (1) We are of the opinion that our rule in Smith is in essence the "issues necessarily adjudicated" rule, and the issues adjudicated must necessarily be ultimate fact issues; (2) we have determined that the issue which defendant attempts to foreclose was not an ultimate fact issue, but a collateral or peripheral issue; and (3) the acquittal verdict was not inseparably intertwined with the issue of defendant's veracity on the collateral issue.

In Adams v. United States, 287 F. 2d 701 (5 Cir. 1961), defendant was acquitted on a charge of possession of moonshine whiskey in a car on a Florida highway. Defendant claimed that he was at a party in Georgia. The subsequent conviction for perjury was affirmed. The court stated that the facts in controversy at the perjury trial were not necessarily determined in the possession trial because they were not essential to the prosecutor's case. It further reasoned:

"* * * [T]here is no necessary inconsistency between Adams' innocence of the moonshine charge and the couple's absence from the party. The latter did not destroy the former. The jury conceivably could have discredited entirely the 'party story' and still

have returned a verdict of not guilty. In this situation the authorities dealing directly with perjury prosecutions clearly hold that when the fact is not *necessarily* determined in the former trial, the possibility that it may have been does not prevent reexamination of that issue." 287 F. 2d 705.

The Adams court cited Kuskulis v. United States, 37 F. 2d 241 (10 Cir. 1929), and Lipscomb v. United States, 33 F. 2d 33 (8 Cir. 1929). In Kuskulis and Lipscomb, the basis of the perjury charges was the testimony of the defendants that they had not been present at the time and place of the offenses. In both, res judicata was held no bar. The Adams court viewed those holdings in this light:

"* * * They reasoned that the veracity of the testimony in regard to where the defendant was at the time of the crime was not necessarily and directly determined by an acquittal of the substantive charge. The fact was not directly in issue but represented what these courts described as a purely collateral matter."

See, State v. McCue, 122 N. J. Super. 171, 299 A. 2d 744 (1973).

In the instant case it was in defendant's self-interest to claim that he did not drive the vehicle at all after it entered Rock County. The jury in the speeding case could have disbelieved defendant's testimony of a switch in Jasper, and still have reasonably and rationally concluded that wherever the switch occurred the state had failed to prove beyond a reasonable doubt that defendant was the operator at the time and place of the speeding offense. Such a determination is by no means a determination that defendant did not drive the vehicle in Rock County.

As prescribed by Ashe, we have carefully examined the record of the prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter,[12] and conclude that

---

[12] A transcript of the final arguments was not available since they were not reported. See, Minn. St. 486.02 and Jovaag v. O'Donnell, 189 Minn. 315, 249 N. W. 676 (1933). Attention of the trial courts is directed to the requirements therein noted.

a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.

We hold that the verdict of conviction in the perjury trial does not necessarily import a contradiction of the verdict of acquittal in the speeding trial under our rule in State v. Smith, *supra*, nor does it deprive defendant of his Fifth Amendment rights as defined in Ashe v. Swenson, *supra*.

Affirmed.